Thank you. Good morning, your honors. My name is Merilee Itubewadarama, and along with my co-counsel, Ms. Nasia Haseen, we represent the petitioner Mr. Sakou Doukoure. The petitioner requests that the court reverse the Board of Immigration Appeals' decision regarding Mr. Doukoure's credibility and determine whether there were due process violations. The BIA identified six reasons for determining Mr. Doukoure's credibility. I will be discussing the issues related to the reliance of the board interview, and my co-counsel will discuss alleged inconsistencies related to the interpretation of the French word taunt, as well as due process violations. Your honors, petitioners filed a motion to supplement the record. Petitioners also request that the court grant the motion. We'd like to reserve two minutes for rebuttal. Manage your own time. Thank you, your honors. This is a case about a young man who suffered extreme abuse at the hands of his father and stepmothers throughout his youth, causing a hearing impairment as well as scars throughout his body. Mr. Doukoure fled his home after his life was threatened by his father because he converted from Islam to Christianity and brought dishonor to his family. At age 19, he arrived at the U.S. border where he applied for asylum, and while he was in detention, he was given a choice to proceed in either English or French. Out of these options, Mr. Doukoure spoke French better. However, the dialect utilized by interpreters, as well as Mr. Doukoure, is never confirmed on the record. Turning to the first point, the BIA erred in appalling to IJ's decision regarding Mr. Doukoure's credibility based on two inconsistencies that arose from an unreliable border interview. In matter of JCHF, the BIA provided non-exhaustive lists of factors to determine whether adequate safeguards are present in order to rely upon a petitioner's border interview. Here, the border interview statement should not be relied upon because it does not comply with these adequate safeguards. First, the sworn statement is written in English, meaning that Mr. Doukoure could not read the document on his own. He relied on the interpreter and what the interpreter told him. However, instead of reviewing the question and answers line by line prior to signing the document, it was simply summarized to Mr. Doukoure. In fact, Mr. Doukoure is the one that raises these 188 to 190 of the administrative record. Second, the sworn statement was a result of an expedited removal that does not elicit any details pertaining to Mr. Doukoure's asylum. In fact, on the very first page of this document, it states that if he has any fears concerning his return to Guinea, to let the agent know so that he can get an asylum interview. And in this case, that is exactly what happened. After this interview, there was an asylum interview where he testified to the details pertaining to his claims. Additionally, the border agent only asked at most four questions related to Mr. Doukoure's asylum fear, or excuse me, Mr. Doukoure's fear of returning back to Guinea, notably without any follow-up questions about why he had this fear. Council, I'm sorry, may I ask about the, you mentioned that the sworn statement was written in English, even though the conversation was in French, but the immigration judge said that the statement indicates that the record was read back to him, or the statement was read back to him in French, and he was given an opportunity to make corrections. Do you think that's wrong, or why isn't that a significant fact that the IJ could rely on? Yes, Your Honor, so with regards to this case, government raises the Mukulubutu decision that was recently made. However, that case particularly relies on Saint-Denis Gonzalez, which states that in order for an interview to be reliable, the interpreter must review questions and answers line by line. Mr. Doukoure here stated during his testimony that it was just summarized to him, and in fact, one of the most important details that he mentions is that he told the agent that his mother had abandoned him, and yet on the written version, it said that he had never met his mother. Thus, it's not a reliable source. But isn't it, I mean, isn't it up to the immigration judge to, I mean, I mean, there are some factors that you've identified that undermine its reliability. Those were presented to the immigration judge. Isn't it up to the IJ to sort of weigh those factors and decide, as it seems that he did, and to decide how much weight it should be given? Your Honor, yes, the immigration judge does have some... We do rely upon what the immigration judge finds. However, it's not that the court can give carte blanche to the judge. For this reason, we need to look at more than just that. We need to consider the totality of the circumstances. We also don't know whether Mr. Doukoure was let know what dialect of French they were speaking, and whether he understood the dialect that the interpreter was speaking. Thus, the inconsistencies such as whether Mr. Doukoure last saw his mother, as well as the denomination of Christianity he participated in, should not be relied upon based on the border interview. With regards to the religion, there's also an identification of whether Mr. Doukoure's church had a name. Looking carefully at the record, Mr. Doukoure states that the Catholic church has a name, Iglai Pa, but the Protestant church does not have a name. Thus, the record does not show that there is any inconsistency with regards to Mr. Doukoure's church, and whether the church had a name. It looks like I'm about to run over time, so I'm going to go ahead and pass it over to my co-counsel, Ms. Nassia Singh. Very good. The Fifth Amendment protections serve to allow a petitioner to fully and fairly present the entirety of their cases, which Mr. Doukoure has not been allowed to do. Incorrect translations, his young age, the fact that he is hearing impaired due to the abuse throughout his childhood, the fact that translations were provided to him telephonically while he was detained, as well as the inability to fully communicate his case, are all factors that should be taken into consideration as the evidence that the adverse credibility decision was an error, and that Mr. Doukoure's due process rights were violated. First, the IJNBA erred in finding Mr. Doukoure's testimony that he had no other relatives nearby in Guinea, inconsistent with his testimony about a non-existent aunt, and in refusing to accept Mr. Doukoure's plausible explanation of what he was communicating. Even when there are no due process violations, faulty or unreliable translations can undermine the evidence on which an adverse credibility determination is based. Contrary to the government's argument, the near-identical pronunciation of the French words for tent, tente, and aunt, tente, resulted in an incorrect translation of tente to aunt, rather than tent by the interpreter. If we put ourselves in Mr. Doukoure's shoes, he heard questions about the tent he would visit because that is what he was hearing. In the audio of the recording, your honor, if you listen to it, he actually says that he goes to the tent to prepare himself traditional beverages, and it was actually Mr. Doukoure's aunt. And while the government argues that the substitution of the word tent for aunt does not make sense, however, it does make more sense in the context of the exchange. Furthermore, the mistranslation of one word slightly resulted in the mistranslations of the surrounding words. Finally, there is no substantial evidence to support that the translation was proper, and again, the audio of the record supports the opposite. Thus, all of these points lead to consideration. Was that part of your record before the board? It is actually the motion that we filed to supplement the record. Was it before the board? It came before the board in a motion, but it was denied. So it was not before the board. That is correct. The next issue that I'd like to discuss is how the IJ and BIA violated Mr. Doukoure's right to process by failing to provide accurate interpretation, which presages him as evidenced by his adverse credibility finding. The first point I'd like to discuss is the poor quality and lack of cultural considerations for the interpretation during Mr. Doukoure's testimony. It's important to note Mr. Doukoure's counsel offered the clarification that there had been a misinterpretation at the earliest opportunity possible. She did not speak French, and Mr. Doukoure did not speak English and was even told by the IJ to block out any English being spoken to His counsel also stated that he did not mention the issue at his previous hearing because he did not have a chance to invest some time was required to understand that there was a problem. Nonetheless, Mr. Doukoure's counsel offered the clarification during the next hearing one week later and in the same proceedings, and it would have been a very small inconvenience for the immigration court to provide this modicum of fairness in contrast with the effects that it had on Mr. Doukoure's ability to fully and fairly communicate his testimony. Adequate interpretation must be provided to a critical instance. Here is showcasing the types of evidence outlined by this court in Sion to demonstrate incompetent translation as the instance I mentioned previously in regards to the mistranslation of Tante. And furthermore, the record has multiple sections where there are untranslated portions and total of nine instances in the record on pages 120, 130, 140, 141, and 149, and 150. Lastly, there were also times where Mr. Doukoure communicated that he didn't know every name in French in ER 125 and other instances throughout. Thus, we ask the court to reverse the Board of Immigration Appeals ruling regarding Mr. Doukoure's credibility and find that there were due process violations. Thank you. Okay, we hear from the government. Thank you. Good morning, Your Honors. My name is Kristen Morace, appearing on behalf of the U.S. Attorney General. Your Honors, the crux of this case is whether substantial evidence supports the agency's finding that the petitioner was not credible based not on one, but on numerous inconsistencies throughout his claims, several of which notably went to the heart of his claims, though it wasn't necessary for them to go to the heart of his claims, including an omission that was strongly suggestive of an attempt by the petitioner at the 11th hour to embellish his claims, and the fact the petitioner at times provided non-responsive answers during his testimony that certainly seemed to be for self-serving reasons in looking at the record. Now, in this case, the most critical inconsistency is that the agency relied upon, we would posit, surrounded petitioner's practice of religion in Guinea, the very basis upon which he predicated his asylum application. It became less clear instead of more clear as petitioner was given the opportunity to explain these inconsistencies. For example, looking at petitioner's asylum application, petitioner claims that a friend named Elise introduced him to Christianity, and he doesn't specify at that point whether it was the Catholic religion or the Protestant religion or denomination of Christianity, and he mentions no other friends who introduced him to religion in Guinea. In his testimony, he clarifies that initially by saying that Elise introduced him to the Catholic faith and that he went to church with his friend Elise, described the church that they went to, and then moments later in his testimony says, no, that's, now I'm talking about a Protestant church. That appears to backpedal and say, whereas initially he claimed he gave up Islam and became Catholic, now he's claiming he gave up Islam first. Okay, frozen. What happened? He became Protestant, Catholic religion, and Elise introduced him to the Protestant religion. Now there's two friends for the first time as petitioners confronted with inconsistencies in his claims. Your honors, I'm not sure, are you able to understand? I just got a notice that my motion be unclear? Yes, you froze for a minute. Sorry about that. Yeah, thank you. Further confusion arose in that petitioner in his sworn statement claimed that he was Protestant, but before the immigration judge claims that he was then currently Catholic, that he became Catholic before he left Guinea. Therefore, the fact that he mentions in his sworn statement that he was Protestant makes no sense. The fact that in his credible fear interview, if he is Catholic, as he claims, he says when he's asked about the name of his church, he says, not all churches have names and gives no name for the church, but then later claims that the Catholic church was the Pax church and that it was the Protestant church that had no name. All of the confusion surrounding these claims certainly cast doubt on whether or not petitioner did practice these Christian religions that he claimed. The fact that he does specify and differentiate between the two certainly shows that he understood that there were differences and that these were two discrete denominations of the Christian faith. He didn't simply refer to his practice of religion as Christian without understanding the difference. In addition to this, the omission in petitioner's claim until his direct examination testimony of someone being stoned for refusing to practice Islam certainly was an omission that was reasonably relied upon by the agency in this case. It did refer to a third party, certainly not to petitioner. However, the fact that it went directly to the specific harm that petitioner claimed he feared, he was asked, why can't you go back to Guinea? And he said, because if I go back and refuse to practice Islam, I'll be stoned. At that point, the immigration judge asks a follow-up question of, have you seen this happen to anyone? And then for the first time, he claims, yes, that he's seen someone stoned for that very reason. This clearly went directly to the objective reasonableness of his claimed fear of harm in Guinea and was reasonably relied upon in the context of the totality of the circumstances of his case. As to petitioner's translation of aunt versus tent in the hearing, and their claims that this was a due process violation or meant that petitioner did not receive his due process rights and was denied a full and fair hearing, the record certainly does not indicate that petitioner was denied such protections. The record shows that the immigration judge told him that if he didn't hear a question to ask to have it repeated, and the instances in the record where he does ask a question is repeated, and he is able to then respond to the question. Several of the points at which they're claiming that there appears to be a problem seem to be portions in the record where petitioner is confronted with an inconsistency and is changing his claim or adding to his claim. With regard to the tent versus aunt, your honor, you're completely right, in that if you look back at those portions of the record, beginning at page 138 in the record, it makes no sense for a petitioner to be claiming, when I was sick, sometimes I went to see the tents so they could prepare me a traditional beverage to heal myself. And then later when he's asked about this inconsistency, the judge says, you were asked, did you have any other family members you could go to? And you said no when asked about family you had in the area. Now you're saying you had an aunt in the area who you went to who would make some special drink for you. Can you explain this inconsistency? Petitioner, if we're it's in a field, it lives in the field. As translated, it's well because at the time the aunt I'm mentioning, she's in the field, she lives in the field. It doesn't, the record certainly doesn't compel the conclusion that this is what he was saying or compel the conclusion that it wasn't reasonable for the agency to rely in part on this inconsistency and finding that petitioner's testimony simply wasn't credible as to his claim. With regard to the border. I'm sorry, could you just address, maybe as a more general matter, what is the obligation of the immigration judge when there's some question as to the reliability of the translation? Because here, council tried to raise the issue and the IJ said you're raising it too late. But if council doesn't understand the language that the petitioner is speaking of, it wasn't clear to me how council could have raised it any earlier. So how is that supposed to work? Certainly, your honor. Well, the petitioner certainly at the time could have asked for further clarification. But even if it wasn't until the next hearing, when they're claiming that there was a problem, this was noted for the first time after this inconsistency arose, the immigration judge was in the best position and did extensively question the petitioner at the time about this issue. When there appeared to be an inconsistency, this wasn't one question and one answer. He was to explain his testimony and particularly in light of the amount of time that was spent on the issue and the number of times and the number of different ways that he was asked about it. And that we're talking about relatives and family as well as just using the word on when he's asked questions about it. The immigration judge was in the best position to see and know whether this seemed to be a problem with the translation or whether this was an attempt by the petitioner to explain an inconsistency in a way to try to make himself appear more credible. And with regard to the motion to supplement the record that was filed on Thursday or Friday, in this case, your honors, this audio recording was not before the board in this case. Petitioners have already filed and had denied a motion to reopen or reconsider on this tent versus aunt issue. They've had years to obtain this audio recording or put it before the board and have not done so. And contrary to the claim in their motion to supplement, listening to this does not make it apparent that there was a translation error or show that this is a clear evidence that there was a mistake made. I think it sheds as much light on the issue as the transcript in this case. And the fact that it wasn't before the board certainly is well settled in this court, that evidence that was not before the agency wouldn't be considered by the court in the first instance. Again, the fact that even though petitioner had over a year to get this evidence from when they definitively knew that it was something they could seek, but waited until last week apparently to do so and brings it now, I think is a bit disingenuous of the claim that this is a silver bullet that suddenly shows that there are due process violations. But again, the proper course would be to attempt to present it before the board if that is their argument or their statement. Your honors, finally, I'd like to, if I could address the petitioner's non-responsive answers at times during his hearing. Now the immigration judge can base a credibility determination on a petitioner's non-responsive answers so long as that's identified in the record. And here the immigration judge did just that with perhaps the most glaring example of it during petitioner's testimony when he is describing an incident in which he's being threatened by his father with a machete and is asked how far away was he from you. Petitioner's initial answer, I don't use numbers, was his answer to that question until the immigration judge reminds him that he has used numbers previously in his testimony and then petitioner relents and gives an answer of 50 meters away. This was certainly a disingenuous answer to claim that he doesn't use numbers. Petitioner's brief incorrectly states that the transcript doesn't show there was an earlier point at which petitioner used large numbers for distances. The records replete with instances of petitioner using numbers. He claims that he lived two kilometers from the center of town, that his house was 15 meters away from his other family's homes, that the fields where he worked were 20 kilometers away from home. He describes distances between cities as approximately 600 kilometers or towns being 50 to 30 kilometers away. This is a clear example of petitioner trying to evade a question where the answer would not serve his claim or in fact show that his father was some distance away and he was never in imminent danger during this incident, which was one of the primary bases for his asylum claim. Your honors, unless there are any questions from the court for the reasons discussed here at argument and in respondent's brief, we would ask the court uphold the agency's adverse credibility finding in this case. Thank you. Thank you, counsel, and I'll give you two minutes for rebuttal that you requested. Can you put that on the clock? There you go. Thank you so much, your honors. I'd like to raise two points that the opposing counsel brought up. First, with regards to the omission, the omission was related to third-party harm, which this court has found bears no weight on petitioner's credibility. Second, with regards to the large numbers that the opposing counsel just brought up, if one looks at the record, the immigration judge actually made a factual error. The petitioner stated 15 meters, not 50 meters, and Mr. DeCourt, again, is a victim of domestic violence and has issues with responding to individuals with authoritative demeanors. Furthermore, with regards to the motion to supplement, your honors, this is not new evidence. This was available, as opposing counsel has stated, was available to the BIA, but they rejected to listen to the audio. In fact, they told the petitioner to listen to the audio. Again, we became attorneys on record at the beginning of the year, and we were able to obtain that record and listen to it. With regards to the taunt versus taunt issue, again, if we were able to consider it with regards to the sentence where Mr. DeCourt says, the ant like the hut, again, that doesn't make sense. The clearer answer would have been the tent like the hut. Additionally, with regards to the non-responsiveness, Mr. DeCourt, it's clear that Mr. DeCourt had issues with language on the record, specifically during the religious part. He says multiple instances. He says, I don't understand, I don't understand, I don't understand, and yet the immigration judge didn't question anything with regards to the translation issues. He just continued on. Thus, the petitioner requests that this court find that there was an issue with regards to the adverse credibility finding, as well as due process violation, and grant the motion to supplement the record. Thank you, your honors. Thank you. Thank you all for your arguments, and I want to thank both of you for your pro bono representation of this client. The case of DeCourt versus Barr will be submitted for decision.
judges: Kelly, Thomas, Miller